Justice Ingrid Gustafson, concurring in part and dissenting in part.
¶114 I concur in the Majority's holding that the District Court abused its discretion by admitting statements Dr. Mueller, a forensic pathologist, made while he performed the autopsy when Dr. Mueller was unavailable to testify at trial such that reversal and remand for a new trial is appropriate. I do not concur in the remainder of the majority opinion.
¶115 Issue 1: Did the fifteen-year preaccusation delay unconstitutionally prejudice Laird?
¶116 Laird asserts he suffered actual, substantial prejudice from the State's delay in prosecution by the death of Russell Renner. According to Laird, "[i]n his statement, Renner said he saw the Lairds arguing outside their trailer on the night [Kathryn] died. Renner then saw Laird drive away, followed closely by Kathryn in her car. Renner saw Laird and Kathryn return to the trailer, then saw one of the cars ***71 leave." Laird asserts Renner's statement was important as it contradicted the testimony of the Andersons in key respects and corroborated statements he made to the Missouri Bar. The majority concludes that since Renner's statement was not included in the record, we have no evidence to consider and thus Laird failed to present definite, nonspeculative proof Renner's death prejudiced him. This conclusion is rather disingenuous as the State did not refute Laird's characterization of Renner's statement and, in essence, conceded it to be inconsistent with the testimony of the Andersons and corroborative of Laird's statements[1] to the Missouri Bar. Anyone with trial experience knows the tremendous value of presenting an independent witness, with no apparent motivation to deceive, who corroborates the defendant's version of events. I would conclude Laird was prejudiced by Renner's death.
¶117 Laird also contends he was prejudiced by the loss of physical evidence-primarily, tissue samples from Kathryn's body. Prior to trial, Laird attempted to locate the tissue samples Dr. Bennett excised from Kathryn's body by requesting such from Yellowstone Pathology Institute (YPI). YPI did not provide him any samples or otherwise respond to his request. At trial, the State, knowing that the samples were lost or unavailable to Laird, criticized Dr. Bennett for failing to review the tissue samples and do any follow-up report. The majority, while ignoring the State's clear failure to preserve the tissue samples collected by the State in its investigation,[2] baldly concludes "we cannot find the State's criticism during its closing statement of Dr. Bennett's failure to review the tissue samples prejudiced Laird's right to a fair trial." This flies in the face of common sense. The State has an obligation to disclose evidence, including tissue samples, to Laird. None were disclosed to him and the State did not refute the loss or lack of availability of the samples. To then use this loss or unavailability of the samples-which were collected during the State's investigation and should have been maintained by the State-to discredit the testimony of Dr. Bennett was inappropriate and very prejudicial. There is no place for such tactics in a fair trial.
***72 ¶118 By concluding Laird suffered no prejudice from the fifteen-year preaccusatory delay, the majority determined it did not need *445 to address the State's reasons for the delay or perform a balancing inquiry. The State's delayed prosecution was not based on discovery of new information, but instead based on information known to law enforcement within hours to days after Kathryn's death. I would conclude the State's failure to interview the Andersons-who were known and available witnesses-within days of Kathryn's death, until well over a decade later, and the resulting presentation of their invariably time-dimmed recollections as critically key evidence in this wholly circumstantial case, was extremely prejudicial to Laird and unfairly impaired his ability to mount a defense.[3] ***73 ¶119 Issue 2: Did the State present sufficient evidence in its case-in-chief to overcome Laird's motion to dismiss for insufficient evidence?
¶120 Although the majority takes great pains to point out the number of witnesses called by the State and details incidents of verbal altercation between Laird and Kathryn and an incident where Laird threw a bag of cookies at Kathryn, hitting her in the head, in the days preceding Kathryn's death, the majority overlooks the most critical element the State must prove-that the manner or cause of death was at the hands of another rather than resultant from accident, suicide, or natural cause.
¶121 In viewing the State's case-in-chief evidence in the light most favorable to the prosecution, although a rational trier of fact could conclude the Lairds had arguments in the days preceding Kathryn's death, it could not conclude beyond a reasonable doubt that Kathryn's death resulted from a criminal element versus accident or suicide. While not every homicide prosecution will require expert medical testimony where the mechanism of injury and manner of death is obvious-such as gunshot wounds or the like-where, as here, there is a body and the physical evidence is equally supportive of suicide or accident, I would conclude medical testimony to be necessary to establish the manner or cause of death.[4] Thus, I would conclude there *446 was insufficient evidence presented in the State's case-in-chief such that it was error for the District Court not to grant Laird's motion to dismiss for insufficient evidence.
¶122 Issue 3: Did the District Court abuse its discretion by admitting statements a forensic pathologist made while he performed the autopsy when he was unavailable to testify at trial?
¶123 I concur in the majority's holding that the statements made by Dr. Mueller were out-of-court statements offered in evidence to prove the truth of the matter asserted were hearsay and inadmissible. I further concur the error in admitting these hearsay statements was not harmless and violated Laird's rights of confrontation.
***74 ¶124 Laird also asserts the District Court abused its discretion by permitting the State to admit autopsy photographs through Agent Jackson. It is clear the State was attempting to lead the jury to conclude marks on Kathryn's head and neck demonstrated bruising and evidence of premortem incapacity. The problem with this is that the State, as noted by the majority, did not in its case-in-chief provide any expert medical testimony to establish the bruising or marks were resultant from premortem injury. The only medical testimony presented at all was that of Dr. Bennett during Laird's case. Dr. Bennett specifically testified the markings did not come from premortem injury and were consistent with drowning or the embalming process. Upon retrial, unless the State can present expert medical testimony to establish the markings on Kathryn's body were resultant from pre-death injury, the photographs lack any probative value and would serve no purpose other than to inject unfair prejudice into the trial.
Justice Dirk M. Sandefur joins in the concurring and dissenting Opinion of Justice Gustafson.
DIRK M. SANDEFUR, J.

That the microscopic tissue samples apparently no longer were available also meant the State could not have had the tissue independently examined, even had it known sufficiently in advance of trial that Dr. Bennett would change his opinion.

The District Court specifically concluded the body tissue samples were no longer available.

Per the research conducted and presented by Dr. Craig Stark, a memory researcher at the University of California Irvine's School of Biological Sciences, presented in The Neuroscience of Memory: Implication for the Courtroom , memories are not indelible, routinely become distorted and change, and the confidence and accuracy of memories are not always tightly linked. Memories of an event can be distorted through misinformation effect which is "a distortion in an original memory or creation of a false memory after being exposed to misleading information related to the memory. The 'misinformation' is considered 'misleading' in that it distracts from the true memory, not because it is purposefully deceitful." Misleading information is often subtle and unintentionally given. Distortions can also result from feedback provided to the witness. "Distortions can also occur simply with the passage of time and with repeated recounting of events." For example, in a study following the 9/11 terrorist attacks, individuals were asked to recall the event one to two weeks after 9/11, one year later, and three years later. In year one, memories of the details had changed in 37% of individuals and in 43% of individuals three years later. These changes resulted from media attention and by talking about the event during the intervening time. Further, these types of memory distortions increase as a person ages. "[A]s people age, memory for the gist of an event may remain intact, but memory for specific details of the event degrades and individuals are more likely to falsely incorporate similar information into [their] memories." "[E]xperiencing an event can lead to the automatic retrieval of information that is not present but has been previously associated with similar events ... As a result, whatever happens in this event becomes associated not just to elements that are actually present, but also to what we expect to be present based on our prior experiences and biases." Joyce W. Lacy and Craig E. L. Stark, The Neuroscience of Memory: Implication for the Courtroom , Nature Reviews Neuroscience 14, 649-58 (2013).
Here, the State has asserted the case broke open when law enforcement interviewed the Andersons twelve years after Kathryn's death. The Andersons, who over the preceding years had occasion to repeatedly discuss the event amongst themselves and with others in the community and who had aged an additional 12 years, provided details inconsistent with Laird's statements based in large part on their perceptions about their dog barking primarily when men versus women were present. I am particularly troubled that due to the significant passage of time and the ability to create memories based on outside influences such as community gossip or integration of prior similar experiences, the Andersons's recollections of events, although firmly believed by them, are unreliable.

I do not conclude that lack of a body precludes homicide prosecution. The lack of a body itself may be compelling evidence of the manner or cause of death being a criminal. Where a body exists and the mechanism of death is not obvious, to not require expert medical testimony to establish the manner of death sets a standard far below that of even summary judgment in a civil cause. See Estate of Willson v. Addison , 2011 MT 179, ¶¶ 16-19, 361 Mont. 269, 258 P.3d 410.